IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

EZRA A. FLEMING-RALSTON,

Appellant.

No. 88032-2-I

DIVISION ONE

UNPUBLISHED OPINION

CHUNG, J. — Ezra Fleming Ralston was convicted of two counts of aggravated murder in the first degree, conspiracy to commit murder in the first degree, and arson in the first degree. He seeks reversal of his convictions on multiple bases. First, he asserts the court denied him his right to present a defense by excluding expert testimony about his autism diagnosis to explain why he lacked the requisite mens rea. Second, he argues the court improperly restricted his ability to cross-examine a former codefendant about his plea agreement in exchange for testifying for the prosecution. Third, he contends the State violated his confrontation clause rights when it encouraged the jury to consider his codefendant's confession as evidence against him. Additionally, Fleming Ralston argues that as charged and proven, his convictions for both conspiracy to commit murder and aggravated murder violate double jeopardy. Regarding his sentence, he argues that the court lacked authority to impose consecutive terms of life without parole for his two counts of aggravated first degree murder and deadly weapon

enhancements. Lastly, he asserts the trial court erroneously imposed discretionary legal financial obligations (LFOs) despite his indigence. We direct certain ministerial revisions to Fleming Ralston's sentence and otherwise affirm.

FACTS

Around the end of 2013, Fleming Ralston moved from Texas into his grandparents' Washington home so he could establish residency and attend a state college. Though he did not successfully attend college, he stayed at his grandparents' house and worked at various jobs. The relationship between Fleming Ralston and his grandparents was strained, and he discussed plans to get property and set up a commune with his friends and girlfriend, Rebecca Neubauer.

Still living with his grandparents during the start of the COVID-19 pandemic, Fleming Ralston grew frustrated with restrictions placed on him, and he talked to friends and acquaintances about killing his grandparents. Ultimately, Spencer Kleine and Kleine's friend, Sean Higgins, agreed to participate in such a murder. Subsequently, on May 17, 2020, Fleming Ralston's grandparents, Theodore Ralston and Joanna Gormley, were found murdered after their house was set on fire.

The State charged Fleming Ralston, Higgins, and Kleine with the murders of Ralston and Gormley, along with other crimes. Fleming Ralston and Higgins were tried together, whereas Kleine agreed to testify against Fleming Ralston and Higgins in exchange for a reduced charge and sentence. Pursuant to the agreement, Kleine would receive the benefit of this bargain only if the State agreed his testimony was truthful.

Higgins described his own involvement in causing the grandparents' deaths to police in a statement that was later admitted at trial against him.[1]

Fleming Ralston moved to introduce expert testimony from forensic psychologist Delton Young concerning his autism diagnosis in order to negate intent. The trial court granted the motion in part, allowing Young to testify to "autism in general," the fact that Fleming Ralston had "been diagnosed with autism," and the symptomology that Young observed related to Fleming Ralston's autism. However, the trial court forbade discussion of Fleming Ralston's autism as it directly related to the charged crimes.

According to Kleine's and Higgins's testimony, they went to Fleming Ralston's house and killed his grandparents, and Fleming Ralston assisted them. The deaths were discovered shortly thereafter due to a fire Fleming Ralston set in the house. Fleming Ralston was arrested the following day at Neubauer's home.

The jury convicted Fleming Ralston of two counts of aggravated murder in the first degree, with deadly weapon enhancements for each count, based on the aggravating factor that more than one person was murdered and the murders were part of a common scheme or plan. He was also convicted of conspiracy to commit murder in the first degree with a deadly weapon enhancement and arson in the first degree.

The court sentenced Fleming Ralston to two consecutive terms of life without the possibility of parole, as well as three consecutive 24-month deadly weapon enhancements, a consecutive term of 240 months for conspiracy, and a concurrent term of 89 months for arson. The court also ordered him to pay a $200 criminal filing fee, a

---

[1] The court provided a limiting instruction stating that the jury "may consider a statement made out of court by one defendant to law enforcement as evidence against that defendant; but not as evidence against another defendant."

$500 victim penalty assessment (VPA), and a $100 DNA collection fee, as well as interest on restitution.

Fleming Ralston timely appeals.

DISCUSSION

Fleming Ralston challenges his convictions on multiple bases. First, he argues that his right to meaningfully present a defense was denied when Young was not permitted to testify about Fleming Ralston's autism diagnosis in the context of the crimes. Second, he asserts his right to a fair trial was denied when the court limited his ability to cross-examine Kleine about Kleine's plea deal with the State in exchange for his testimony. Third, he contends the State violated his confrontation clause rights when it discussed Higgins's admitted inculpatory statements and referenced Fleming Ralston. Separately, Fleming Ralston challenges his convictions for both conspiracy and murder on double jeopardy grounds. Finally, he claims the trial court lacked statutory authority to impose consecutive life sentences, deadly weapon enhancements, and LFOs.

I. Expert Testimony about Autism

Fleming Ralston argues that the court's restriction on his expert psychologist's testimony about his autism denied him an ability to meaningfully present his defense. We disagree.

"A criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions." State v. Jennings, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022). When a defendant argues that an evidentiary ruling has violated their constitutional right "to present a defense," we engage in a two-part analysis. State v. Ritchie, 24 Wn. App. 2d 618, 627, 520 P.3d 1105 (2022). "First, we review the trial

4

court's ruling for an abuse of discretion, applying the evidentiary rule or evidentiary statute at issue. Second, we consider de novo whether there has been a violation of the defendant's Sixth Amendment rights." Id. (citations omitted).

Each crime with which Fleming Ralston was charged had a different mens rea. To convict Fleming Ralston of aggravated first degree murder, the State had to prove his specific, premeditated intent. RCW 10.95.020; RCW 9A.32.030(1)(a). To convict him of conspiracy to commit first degree murder, the State had to prove he intentionally conspired with others to commit first degree murder. RCW 9A.28.040(1). To convict him of arson, the State had to prove he knowingly or maliciously caused a fire that damaged a dwelling. RCW 9A.48.020(1)(b).

Fleming Ralston made clear he was "not asserting diminished capacity" or "insanity." However, Fleming Ralston sought to admit Young's testimony about his autism because it was "relevant to understand his intent and suggestibility." Specifically, Fleming Ralston sought to admit Young's testimony about "what autism is," the fact that he was "diagnosed with autism," and why the diagnosis "matters when a person who's accused of these offenses is autistic, . . . specifically [his] weakened fragment[ed] sense of self, his proneness to absorbing the ideas and perspectives of others, unusually poor executive cognitive abilities and capacities, and loss of any sense of perspective in the scale."[2] In response, the State did not have a position as to Young's testimony about

---

[2] During the parties' initial pretrial discussions, the court ruled Young's testimony would be "admissible in part." Fleming Ralston reiterated he was "not presenting a diminished capacity or a not guilty by reason of insanity defense," but that Young's testimony was relevant to Fleming Ralston's "intent, as well as to sort of explain his courtroom demeanor." The court at that point ordered the defense to provide the State with Young's report, but stated it would not prevent the State from later moving to limit the scope of his testimony based on his qualifications. Later, during trial, the defendant proffered Young's testimony, and the State had the opportunity to cross-examine him. The court then ruled on Fleming Ralston's motion to admit Young's testimony, allowing some but excluding other parts of the proffered testimony.

Fleming Ralston's demeanor in court, nor did it have a problem with Young's testimony that Fleming Ralston had been diagnosed recently with autism. The State also noted that Young himself said that while he could testify that Fleming Ralston was considerably impaired cognitively, he "could not say that his ability to form intent was significantly impaired."[3]

The court ruled that Young could testify "about what autism is, that this defendant has been diagnosed," and his observations of Fleming Ralston's symptomology. However, the court limited Young's testimony beyond that:

> The jury will be left to decide whether the things that autism brings to the table had any impact in the planning and preparation and execution of this event as it relates to [ ] Fleming Ralston. . . . I'm not going to allow him to speculate on how it may have impacted him, specifically with regard to the facts of this case.

In other words, Young was not permitted to discuss whether Fleming Ralston's symptomology "played any role with regard to his interaction with specific people," including the other co-defendants, but could speak to his own observations of Fleming Ralston.

Turning to the first part of the two-part test for the right to present a defense, we review the court's evidentiary ruling for abuse of discretion. Ritchie, 24 Wn. App. 2d at 627. "For evidence to be admitted at trial, it must be relevant. ER 402. Evidence is relevant if it tends to prove or disprove the existence of a fact of consequence to the outcome of the case." Id. Ordinarily, "observation testimony regarding relevant facts is generally admissible and does not implicate the pleading requirements for diminished

---

[3] Young stated that he "couldn't opine that [Fleming Ralston] was unable to form the intent," and "all [Young] could do [wa]s provide a diagnostic formulation and a description and the opinion that . . . he may not have formed the intent, premeditated intent."

capacity, even if offered to rebut the State's mens rea evidence." State v. Clark, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). "However, expert opinion testimony that a defendant has a mental disorder that impaired the defendant's ability to form the requisite mens rea is relevant only to diminished capacity." Id.

"Diminished capacity 'allows a defendant to undermine a specific element of the offense, a culpable mental state, by showing that a given mental disorder had a specific effect by which [their] ability to entertain that mental state was diminished.' " Id. at 650-51 (quoting State v. Gough, 53 Wn. App. 619, 622, 768 P.2d 1028 (1989)). "The intent to assert diminished capacity 'must be declared pretrial.' " Id. at 651 (quoting State v. Harris, 122 Wn. App. 498, 506, 94 P.3d 379 (2004)).

In Clark, the defendant shot the victim in the back of the head and killed him. 187 Wn.2d at 645. The "primary disputed issue" was intent because the State charged the defendant with premeditated murder, but the defendant contended the shooting was an accident. Id. Before trial, the defendant sought to introduce expert testimony concerning his "intellectual deficits" in order to, among other things, "help the jury understand [his] affect during testimony," and "to contest the State's mens rea evidence." Id. at 646. The trial court excluded portions of the expert testimony, partially because the defendant "specifically disavowed any intention to argue diminished capacity," and, thus, evidence of intellectual deficits would be "irrelevant and confusing." Id. However, it did "allow for relevant observation testimony bearing on [the defendant's] intellectual deficits, including his participation in special education, his receipt of Social Security disability benefits, and 'that people [who] knew him considered him slow or tended to discount his testimony.' " Id.

Although defendant's trial counsel had asserted the expert testimony "was not actually diminished capacity evidence," on review, our Supreme Court disagreed and determined "the record indicated otherwise." Id. at 651. The court noted that

> the primary intended purpose for the [expert's] testimony . . . was to rebut the State's mens rea evidence on the basis that [the defendant's] clinically evaluated intellectual deficits impaired his ability to understand and assess the risks of his behavior, thereby reducing the likelihood that [the defendant] acted with a culpable mental state when he shot [the victim].

Id. Then, the court reasoned,

> [R]elevant observation testimony tending to rebut any element of the State's case, including mens rea, is generally admissible. However, expert opinion testimony that a defendant has a mental disorder that impaired the defendant's ability to form a culpable mental state is, by definition, evidence of diminished capacity. And where, as here, the defense does not plead diminished capacity, such testimony is properly excluded.

Id. at 653.

Clark is dispositive here. Young was allowed to testify to "relevant observation testimony" about Fleming Ralston. Like the defendant in Clark, Fleming Ralston sought to challenge the element of intent by introducing expert testimony that a mental disorder possibly impaired his ability to form the requisite mens rea. But Fleming Ralston explicitly disavowed a diminished capacity or insanity defense. Because Clark made clear that this type of expert opinion testimony is not relevant unless a defendant pleads diminished capacity, the trial court did not abuse its discretion by limiting Young's testimony.

For the second step of the analysis of an alleged violation of the right to present a defense, we must determine whether the trial court's ruling, "despite being a proper application of the evidentiary rules, nonetheless runs afoul of either the state or federal constitutions." Ritchie, 24 Wn. App. 2d at 628. "Ultimately, the pertinent concern is

whether both parties receive a fair trial." Id. at 634. "At its core, the constitutional right to present a defense ensures the defendant has an opportunity to defend against the State's accusations." Jennings, 199 Wn.2d at 66. "Accordingly, when the defendant has an opportunity to present [their] theory of the case, the exclusion of some aspect of the defendant's proffered evidence will not amount to a violation of the defendant's constitutional rights." Ritchie, 24 Wn. App. 2d at 635.

Here, the defense theory was that Fleming Ralston's autism impaired his ability to form a culpable mental state, so it was "relevant to understand his intent and suggestibility." Although the court limited Young's testimony on this subject, it still allowed Young to testify about the formal testing he conducted on Fleming Ralston,[4] the general symptoms of autism, and Young's observations, including Fleming Ralston's specific symptoms. Young diagnosed Fleming Ralston with "Autism Spectrum Disorder" and opined that he displayed symptoms of a "weak and fragmented sense of self," was "prone to absorbing the ideas and perspectives of others," had "an unusually poor executive cognitive capacity," and "does not have any sense of perspective in scale," which "come[s] under the broad heading of judgment." Young proceeded to provide an example from Fleming Ralston's teenage years that demonstrated his warped ability to appreciate the impact of suggested plans.[5]

---

[4] For example, Young administered two formal tests to evaluate Fleming Ralston, the "Social Responsivity Scale" and the "Comprehensive Executive Functioning Inventory." These tests include reviewing school and mental health records, materials gathered by law enforcement, and interviewing those who know the individual best.

[5] On direct examination, the following exchange took place:

A[nswer (A).]      So, I can refer to the incident with the guns?
. . . .
[Question.]      Yes, please proceed.

In closing, Fleming Ralston reminded the jury of these symptoms and asked them to consider the charges "against the backdrop of the testimony of" Young. Fleming Ralston also highlighted that Young's diagnosis of "Autism Spectrum Disorder" derived from the same materials that the jury had reviewed and that the diagnosis and his associated symptoms did not support the State's assertion that Fleming Ralson was "a director" of these crimes, as the State was attempting to argue. Because Fleming Ralston was able to present testimony that could be used by the jury to contextualize his intent and the alleged role he played in the crimes, the court did not violate his constitutional right to present a defense by excluding, as irrelevant, Young's testimony that Fleming Ralston's autism impaired his ability to form a culpable mental state— which was "by definition, evidence of diminished capacity." Clark, 187 Wn.2d at 653.

II. Testimony about Kleine's Plea Agreement

Fleming Ralston also contends that he "was denied a fair trial by the court's improper limits on questioning" Kleine, a former codefendant who participated in the charged crimes and entered into a plea agreement to testify as a State witness.

The plea agreement required Kleine to enter a guilty plea as charged, for two counts of aggravated murder in the first degree, and to testify against Fleming Ralston and Higgins. By pleading guilty, Kleine was subject to a mandatory sentence of life in prison without the possibility of parole or early release. However, if the State found that

---

A.    At one point in the past, some individuals decided that they thought they should overthrow the United States Government and thought that if they gathered up a few hunting rifles, they could do that.

And these are people who are not necessarily impaired intellectually, but who had immeasurably poor judgment thinking that they could take some guns and overthrow the United States. That's the sense of scale that's off by about ten thousand times.

Kleine's testimony was truthful and complete, it would allow Kleine to withdraw the existing plea and enter a plea to two counts of murder in the first degree, removing the aggravating factors. In exchange, the State would recommend a sentence of two consecutive twenty-year (240-month) terms, the low end of the standard range for first degree murder, totaling 40 years.

The State filed a motion in limine to exclude "impermissible questioning or evidence related to [Kleine's] plea agreement." More specifically, the State argued that Kleine should not be allowed to testify that he pleaded guilty to the crime of aggravated first degree murder. Although the State agreed that Fleming Ralston could cross-examine Kleine about the penalty he faced for that charge, it did not want the jury to learn that he pleaded guilty to the same offense with which Fleming Ralston and Higgins were charged. The State argued that this information would impermissibly allow the jury to infer they faced the same mandatory penalty.[6] Ultimately, the trial court ruled that counsel could not elicit the name of the crime to which Kleine pleaded guilty, i.e., could not use "the phrase 'aggravated' as it relates to the murder charge."

During trial, the State elicited from Kleine that he was facing "life without parole" before the plea deal. Kleine further testified that he understood that even if he got the benefit of what he bargained for, "that maximum [sentence] is still the possibility of life in prison." Kleine also acknowledged that while the State agreed to recommend a 40-year sentence, the judge was "the only one who will decide what sort of sentence in that range . . . will be granted." On appeal, Fleming Ralston does not directly challenge the court's ruling that limited the State's questioning but instead claims "[t]he prosecution

---

[6] The State additionally requested in their motion in limine to more broadly preclude references to the possible mandatory sentence Fleming Ralston may be given if he were convicted.

took advantage of this ruling to mislead the jury about the benefit [] Kleine obtained by the plea agreement" and mischaracterized the agreement.[7]

"Both federal and state constitutions protect a defendant's right to confront an adverse witness." State v. Lee, 188 Wn.2d 473, 486, 396 P.3d 316 (2017); see also U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. " 'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.' " Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (quoting Douglas v. Alabama, 380 U.S. 415, 418 (1965)). "Cross-examination allows the defendant to 'test the perception, memory, and credibility of witnesses.' " Lee, 188 Wn.2d at 487 (quoting State v. Darden, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002)). "Whenever the right to confront is denied, the ultimate integrity of this fact-finding process is called into question. As such, the right to confront must be zealously guarded." Darden, 145 Wn.2d at 620 (citations omitted).

"But the right to confront a witness through cross-examination is not absolute." Lee, 188 Wn.2d at 487. " '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " Id. (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985)). Indeed, " 'trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-

---

[7] We reject the State's argument that Fleming Ralston waived this argument on appeal because he did not contemporaneously object to the alleged "mislead[ing]" questioning and responses that suggested Kleine would face a maximum of life in prison. As Fleming Ralston notes, he did object to the State's request to limit Kleine's testimony about the benefit of the bargain. Before trial, in support of its request, the State argued that "the significance isn't the title . . . of the charge; it's the difference in time. That's the part that conveys to the jury that he's receiving the benefit. . . . All [defendants] care about is the number of months on the sentence." When the court noted, "There is a difference between the only penalty and the maximum penalty," Fleming Ralston responded, "Well, that's very true, but there is only a [single] penalty, which is the maximum penalty for Aggravated Murder in the First Degree." Because Fleming Ralston had already argued in opposition to the State's motion in limine regarding Kleine's testimony about the benefit of the bargain, he did not have to object each time to preserve an objection.

examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " Id. (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). We review a limitation of the scope of cross-examination for an abuse of discretion. Lee, 188 Wn.2d at 486.

We engage in a three-part test to determine whether a trial court violated a defendant's right to confront a witness by limiting the scope of cross-examination:

> First, the evidence must be of at least minimal relevance. Second, if relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial. Finally, the State's interest to exclude prejudicial evidence must be balanced against the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise relevant information be withheld.

Darden, 145 Wn.2d at 622 (describing the "Hudlow[8] test"). As to the first part of the test, "[g]enerally, evidence is relevant to attack a witness'[s] credibility or to show bias or prejudice." Lee, 188 Wn.2d at 488. An accurate explanation of the substance and "benefit" of Kleine's agreement with the State—in particular, the reduced potential sentence if the State found Kleine's testimony truthful—was relevant to show Kleine's bias. Indeed, "the more essential the witness is to the prosecution's case, the more latitude the defense should be given to explore fundamental elements such as motive, [and] bias." Darden, 145 Wn.2d at 619. Here, Kleine was a key State witness who provided extensive testimony about the planning and the actual commission of the murders.

---

[8] State v. Hudlow, 99 Wn.2d 1, 659 P.2d 514 (1983).

Without engaging in the Hudlow test, Fleming Ralston argues the State denied "his right to meaningfully cross-examine" Kleine and "undercut the extent of the bargain" by implying that Kleine still faced the maximum sentence of life in prison even if he "get[s] the benefit of what [he] bargained for." Fleming Ralston claims that the benefit was that if he pleaded to first degree murder rather than aggravated murder, "the court would be bound by the standard range" of 240-320 months. Instead, the State implied he still faced life in prison.[9] According to Fleming Ralston, this suggestion was misleading because without any alleged aggravating factors—and the agreement did not call for any—a court would have no authority to impose a sentence for first degree murder that was greater than the standard range. Thus, he argues, eliciting testimony that he could still face life in prison was not accurate and minimized the true degree of the benefit of the bargain: a reduction from life without parole to a recommended 240 months.

---

[9] He specifically highlights an exchange during the State's re-cross-examination of Kleine:

Q. Now, counsel also asked you about your guilty plea and what you're hoping to get, and I think you mentioned on direct that you understand that it's what the State recommends to the judge, correct?

A. Yes.

Q. You were told and more specifically asked about when you entered your guilty plea that you were aware that the State makes only a recommendation and that judge makes the decision as to what punishment is actually imposed?

A. Yes.

Q. Do you understand that in your case even getting—presuming you get the benefit of what you bargained for and negotiated through your attorney, that that maximum is still the possibility of life in prison?

A. Yes.

However, here, the court's ruling merely prohibited Kleine from testifying about the name of the crime to which he initially pleaded guilty—*aggravated* first degree murder. The court did not otherwise limit Kleine from testifying to the agreement he had made: that compared to what the court could impose,[10] the State agreed to recommend a lesser sentence—i.e., 40 years rather than life without parole—in exchange for his agreement to testify. At the close of direct examination, Kleine testified that he "took a deal to cooperate with the State and give testimony in return for a deal." He confirmed that he was "facing a significant amount of incarceration before the deal," which was "life without parole," and "as a result of the negotiations," the State would recommend "forty years" of incarceration if Kleine were "to tell the truth" and "not withhold any information." On cross-examination by codefendant Higgins, Kleine again was asked about the deal and the leniency he would possibly receive as a result. He confirmed that according to the agreement, he entered guilty pleas to four separate murder charges and a charge for conspiracy to commit murder. When discussing the murder charges, he agreed that he pleaded guilty "to the most serious exceptional murder charges" and "where the maximum penalty and the mandatory minimum penalty are the same . . . life in prison without parole."[11] On re-cross-examination by Fleming Ralston, Kleine again confirmed that the State could allow him to withdraw his current guilty plea and plead instead to lesser charges and that the only other sentence he could receive without that amendment was life in prison. Thus, even if the State had elicited testimony that suggested Kleine's agreement was less of a "bargain" than it was, i.e., less of a

---

[10] The plea agreement did not, nor could it, limit the sentence the court would actually impose, but only what the State would recommend.

[11] During cross-examination by Fleming Ralston's attorney, Kleine reiterated the above discussed details of his plea agreement.

reduction in sentence, Fleming Ralston was not deprived of the opportunity to cross-examine Kleine about the benefit he derived. Indeed, Kleine testified that while he initially faced life without parole, in exchange for truthful testimony, he would be allowed to plea to lesser charges and the State would recommend a lesser sentence of 40 years.

In light of the other evidence that supported the verdict and the extensive cross-examination of Kleine, any error by the trial court in allowing the State to elicit testimony that Kleine still faced a maximum sentence of life even after the agreement was harmless. "Confrontation clause errors are subject to a harmless-error analysis as laid out in Chapman v. California, 386 U.S. 18, 22-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Under Chapman, before a constitutional error can be harmless, the State must show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " State v. Wilcoxon, 185 Wn.2d 324, 335-36, 373 P.3d 224 (2016) (citations omitted) (quoting Chapman, 386 U.S. at 24).

> Whether such an error is harmless in a particular case depends upon a host of factors, . . . includ[ing] the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

Here, Fleming Ralston was still able to extensively attack Kleine's credibility—which was the purpose of the cross-examination. See State v. Fisher, 165 Wn.2d 727, 753, 202 P.3d 937 (2009) (when considering the confrontation clause, "a defendant has a right to put specific reasons motivating the witness'[s] bias before the jury, not specific

facts"). As discussed above, Fleming Ralston was not prohibited from inquiring about the fact that Kleine had a plea agreement, and Kleine spoke at multiple points throughout his testimony to the details of his agreement with the State and the benefit he could receive—specifically, that his initial plea would result in a sentence of life without parole, but if he testified in a manner satisfactory to the State, the State would recommend a 40-year sentence.

Moreover, Kleine's testimony, while important, was far from the only evidence of Fleming Ralston's guilt. First, the State introduced extensive exhibits of Fleming Ralston's online conversations on Discord and Facebook where he discussed killing his grandparents for over a year prior to the murders. For example, in messages dating back to 2019, Fleming Ralston mentioned he had "been looking for more excuses to kill [his grandparents] and take [their] property." Shortly thereafter he reiterated multiple times that he needed to kill his grandparents and requested help from his friends to coordinate the murders. On the night of the murders, cell phone records showed both Higgins's and Kleine's cell phones moving toward Fleming Ralston's grandparents' residence, while simultaneously, Fleming Ralston sent Discord messages directing the two to his grandparents' house, alerting them to when his grandparents were asleep, and instructing them on which exterior door he had unlocked to let them in. In one message, Fleming Ralston stated they should "be prepared to bestow death to [his grandfather] Ted with urgency." Another witness, Catherine Edwards, who was living in the same apartment as Neubauer and her mother, testified that Fleming Ralston had told her that "he had both of his friends come over" and "they had killed his

grandparents." Thus, the State can establish beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.

III.  Prosecutorial Misconduct

Fleming Ralston next argues he was denied a fair trial because the prosecution improperly encouraged the jury to use Higgins's statements to police as evidence against him, contrary to the court's instruction. The State asserts that despite not framing his argument in these terms, Fleming Ralston is arguing prosecutorial misconduct. Further, the State contends that because there was no objection to the prosecutor's statements, Fleming Ralston must show the prosecutor's conduct was both improper and prejudicial in the context of the entire record. We agree with the State.

We generally review allegations of prosecutorial misconduct for abuse of discretion. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014). The defendant bears the burden of showing the comments were improper and prejudicial. Id. "If the defendant did not object at trial, the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill[-]intentioned that an instruction could not have cured the resulting prejudice." State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill[-]intentioned and more on whether the resulting prejudice could have been cured." Id. at 762. Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on the jury, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. Id. at 761.

18

Initially, Fleming Ralston sought to sever his trial from Higgins's based on the extensive statements Higgins made to police. Higgins discussed the murders at length and spoke to the planning leading up to the murders, his role during the murders, and the steps he took after the murders were complete in an attempt to dispose of evidence. Fleming Ralston argued that the "statements made by non-testifying co-defendants . . . to law enforcement which inculpate [him] cannot be redacted so as to eliminate prejudice." The State filed a motion opposing severance, arguing that its redactions of the statements eliminated any prejudice to Fleming Ralston. The trial court denied the motion to sever, and the State introduced Higgins's redacted statements to law enforcement at trial. The trial court also instructed the jury that they "may consider a statement made out-of-court by one defendant to law enforcement as evidence against that defendant; but not as evidence against another defendant."

However, in its closing argument, the State discussed jury "Instruction No. 1" that informed the jury of their duty to determine "the value or weight to be given to the testimony of each witness" and made the following statement:

> The instruction gives you a few factors to consider. You can decide them for yourself. It's not a complete list. You decide. Quality of memory, manner of how they testify, personal interest or bias, and the reasonableness of their statements and their testimony in light of all the other evidence.
>
> That in particular is very indicative of Mr. Kleine's accuracy. Mr. Kleine's explanation and testimony of what happened that day is corroborated a number of different ways.
>
> One, by Mr. Higgins'[s] statement to law enforcement. He describes what [Kleine] told you. They are extremely consistent. They are not inconsistent to include who did what, in what order, what time, where the tarp had been hid, how they walked down, who went where, when, how they got the bodies to the basement, everything.

19

> Corroborated by the testimony of Catherine Edwards, the young woman who was living or staying with Mara and her mother in the apartment in Lakewood. Catherine told you she was still shaken, still bothered by what she heard when [Fleming Ralston] came over after the fire on the 17th and said that he and [Higgins] and [Kleine] had stabbed [his grandparents] Ted and Joanna to death before he torched the house.

Fleming Ralston did not object to these comments during the closing.[12] On appeal, he contends that through this argument, the State "implicitly urged the jury to use Mr. Higgins'[s] statement as evidence proving Mr. Fleming-Ralston's guilt, by insisting Mr. Higgins'[s] description of events showed Mr. Kleine was telling the truth, and Mr. Kleine blamed Mr. Fleming-Ralston for arranging and encouraging the murders."

In Bruton v. United States,[13] the Supreme Court held that "when a nontestifying codefendant's out-of-court statement implicating the defendant is admitted in a joint trial, the defendant's confrontation clause rights are violated." State v. Fisher, 185 Wn.2d 836, 842, 374 P.3d 1185 (2016). "However, in Richardson v. Marsh,[14] the Court clarified that the protections of Bruton do not apply unless the codefendant's statements facially incriminate the defendant." Id. Therefore, we must determine whether the prosecutor's statements in closing facially incriminated him by impermissibly linking Higgins's statements to Fleming Ralston's guilt, thus undoing the effect of the trial court's instruction.

In Richardson v. Marsh, the State tried Marsh and her codefendant together and introduced her codefendant's redacted confession to be used against the codefendant. 481 U.S. 200, 202-03 (1987). The judge provided a limiting instruction explaining that

---

[12] While Fleming Ralston did not object during closing, he had raised this same concern in his pretrial motion to sever, where he stated, "Undoubtedly, the State intends to argue that the jury should be able to infer from a codefendant's statement that Mr. Fleming-Ralston was involved in the crime."

[13] 391 U.S. 123 (1968).

[14] 481 U.S. 200 (1987).

the confession could not be used against Marsh. Id. at 205. During closing argument, the State again reminded the jury not to use the codefendant's confession against Marsh. Id. However, later in its argument, the State "linked" Marsh to a portion of the codefendant's confession to explain why Marsh's denial of knowing participation in the crime was not credible. Id. Thus, the primary concern in Marsh was whether Bruton's protections apply when a "codefendant's confession is redacted to omit any reference to the defendant, but the defendant is nonetheless linked to the confession by evidence properly admitted against [them] at trial." Id. at 202.

As to the Bruton issue, the U.S. Supreme Court held Marsh's confrontation clause rights were not violated. Id. at 208. The Court reasoned that "[i]n Bruton, the codefendant's confession 'expressly implicat[ed]' the defendant as his accomplice," and thus when "introduced there was not the slightest doubt that it would prove 'powerfully incriminating.' " Id. at 208 (citations omitted) (quoting Bruton, 391 U.S. at 124 n.1, 135). By contrast, the confession in Marsh "was not incriminating on its face, and became so only when linked with evidence introduced later at trial." Id. at 208. Accordingly, "while it may not always be simple for the members of a jury to obey the instruction that they disregard an incriminating inference, there does not exist the overwhelming probability of their inability to do so that is the foundation of Bruton's exception to the general rule." Id.

However, this determination did not resolve the issue on appeal in Marsh given the State's commentary in its closing argument. Id. at 211. Concerned that the "prosecutor sought to undo the effect of the limiting instruction by urging the jury to use [the codefendant's] confession in evaluating [Marsh's] case," the Court remanded for

21

consideration of whether Marsh's failure to object during those comments could "serve as the basis for granting" post-conviction relief. Id.

Here, we conclude the State did engage in misconduct, as the State's comments created an impermissible inferential linkage between Kleine's testimony, which incriminated Fleming Ralston, and Higgins's redacted statements. Thus, it sought "to undo the effect of the limiting instruction." Id. at 211. Like the closing argument in Marsh, where the State suggested the jury could disregard the limiting instruction by explicitly discussing the codefendant's statements in relation to Marsh's testimony, here, the State's comments urged the jury to disregard the court's instruction and to use Higgins's confession to evaluate Fleming Ralston's case. Because of the nature of the violation, Fleming Ralston appropriately highlights that the "prosecution's closing argument nullified the court's instructions and encouraged the jurors to use [] Higgins'[s] statement as evidence confirming [] Fleming Ralston's culpability." Thus, the first element under the heightened standard is met, as the curative instruction the court provided was undermined by the improper comments.

However, Fleming Ralston must also show the prosecutor's statement caused prejudice that had a substantial likelihood of affecting the jury verdict. See Emery, 174 Wn.2d at 761. As discussed above, there was extensive and overwhelming evidence of Fleming Ralston's guilt, including over a year's worth of online conversations that occurred prior to the murders and detailed his desire to kill his grandparents and take their property, as well as requesting the help of his friends to coordinate the murders. He sent multiple messages to others on the day of the murders with explicit directions to his grandparents' house. His instructions of what to do and where to go coincided with

cell phone evidence showing Higgins and Kleine moving toward the house. Moreover, a witness testified that she heard Fleming Ralston explicitly discussing murdering his grandparents. Given the extent of the evidence presented at trial that spoke to Fleming Ralston's guilt, he is unable to show that the State's improper remark had a substantial likelihood of affecting the jury verdict. Accordingly, while it was improper for the State to suggest during closing that the jury may use codefendant Higgins's statements against Fleming Ralston, this argument did not result in prejudice that had a substantial likelihood of affecting the jury verdict.

IV.  Double Jeopardy

The jury convicted Fleming Ralston of two counts of aggravated murder in the first degree, conspiracy to commit murder in the first degree, and arson in the first degree. At sentencing, the court imposed, among other things, separate and consecutive sentences for the convictions of aggravated murder in the first degree and conspiracy to commit murder in the first degree. Fleming Ralston claims that as charged and proven, the conspiracy to commit murder in the first degree merges with his aggravated murder in the first degree convictions. Specifically, he argues that because his convictions for aggravated murder were based on accomplice liability and "the conspiracy conviction also rested on the joint agreement with intent to commit first degree murder of the same people," the overlap of the offenses causes a double jeopardy violation. We disagree.

We review double jeopardy claims de novo. State v. Kier, 164 Wn.2d 798, 804, 194 P.3d 212 (2008). Both the federal and state constitutions prohibit multiple punishments for the same offense. See id. at 803; CONST. art. I, § 9 ("No person

23

shall . . . be twice put in jeopardy for the same offense."); U.S. CONST. amend. V ("No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb."). " 'Where a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense.' " State v. Freeman, 153 Wn.2d 765, 771, 108 P.3d 753 (2005) (quoting In re Pers. Restraint of Orange, 152 Wn.2d 795, 815, 100 P.3d 291 (2004)).

We apply a three-part test to determine whether the legislature intended multiple punishments in a particular situation. Kier, 164 Wn.2d at 804. First, a court must consider the express or implicit legislative intent based on the criminal statutes involved. Id. Second, "[i]f the legislative intent is unclear, we may then turn to the 'same evidence' Blockburger test, which asks if the crimes are the same in law and in fact." Id. (quoting State v. Calle, 125 Wn.2d 769, 776, 888 P.2d 155 (1995)) (citing Blockburger v. United States, 284 U.S. 299, 304 (1932)). "Third, if applicable, the merger doctrine may help determine legislative intent, where the degree of one offense is elevated by conduct constituting a separate offense." Kier, 164 Wn.2d at 804.

As Fleming Ralston notes, none of the statutes under which he was charged expressly authorize multiple convictions for the same act.[15] Next, under the "same evidence" test, "[i]f each offense includes an element not included in the other, and each requires proof of a fact the other does not, then the offenses are not constitutionally the same under this test." State v. Hughes, 166 Wn.2d 675, 682, 212 P.3d 558 (2009). We consider whether the elements of the crimes as charged and proved are the same in

---

[15] Fleming Ralston cited to RCW 9A.32.030 (first degree murder); RCW 9A.28.040 (conspiracy); and RCW 10.95.020 (aggravated first degree murder).

law and fact, not merely an abstract articulation of the elements. <u>Freeman</u>, 153 Wn.2d at 759.

To prove Fleming Ralston was guilty of aggravated murder in the first degree, the State had to show that he was guilty of murder in the first degree and one or more aggravating circumstances exist. <u>See</u> RCW 9A.32.030(1)(a); RCW 10.95.020. Under RCW 9A.32.030(1)(a), "a person is guilty of murder in the first degree when . . . with premeditated intent to cause the death of another person . . . cause[d] the death of such person." Here, the aggravating circumstance charged was that "there was more than one victim and the murders were part of a common scheme or plan." RCW 10.95.020(10). Accomplice liability requires proof that "with knowledge that it will promote or facilitate the commission of a crime" a person "(i) solicits, commands, encourages, or requests such other person to commit it; or (ii) Aids or agrees to aid such other person in planning or committing it." RCW 9A.08.020(3)(a). For accomplice liability, "an individual must have acted with knowledge that they were promoting or facilitating *the* crime for which they were eventually charged, not merely the knowledge that the principal intended to commit *a* crime." <u>State v. Zghair</u>, 4 Wn.3d 610, 621, 567 P.3d 1 (2025).

By contrast, to prove criminal conspiracy, the State had to show that "with intent that conduct constituting a crime be performed," Fleming Ralston agreed "with one or more persons to engage in or cause the performance of such conduct, and any one of

25

them t[ook] a substantial step in pursuance of such agreement." RCW 9A.28.040(1).[16] For a criminal conspiracy charge, the "punishable criminal conduct is the plan." State v. Williams, 131 Wn. App. 488, 496, 128 P.3d 98 (2006) (emphasis added); see also State v. Dent, 123 Wn.2d 467, 476, 869 P.2d 392 ("[C]onspiracy focuses on the additional dangers inherent in group activity."); State v. Bobic, 140 Wn.2d 250, 265, 996 P.2d 610 (2000) ("[T]he appropriate focus in Washington is on the conspiratorial agreement, not the specific criminal object or objects."). Thus, a conspiracy charge requires an agreement with others, whereas the aggravating circumstance for the aggravated murder charge and accomplice liability do not.

The State contends that convictions for criminal conspiracy and accomplice liability do not constitute double jeopardy, citing State v. Gocken, 127 Wn.2d 95, 109, 896 P.2d 1267 (1995). In Gocken, a defendant was convicted "as an accomplice to theft in the second degree following a plea of guilty to criminal conspiracy." Id. at 108. The court reasoned,

> Double jeopardy is avoided under a Blockburger analysis because criminal conspiracy and accomplice liability have separate elements. Criminal conspiracy requires an element of intent, while accomplice liability requires a lesser culpable state of knowledge. Likewise, accomplice liability requires a completed crime, while criminal conspiracy requires only proof that one of the conspirators took a substantial step

---

[16] The relevant jury instruction specified that to prove conspiracy to commit murder, the prosecution had to establish:

(1) That on or about May 17, 2020, the defendant agreed with one or more persons to engage in or cause the performance of conduct constituting the crime of Murder in the First Degree;
(2) That the defendant made the agreement with the intent that such conduct be performed;
(3) That any one of the persons involved in the agreement took a substantial step in pursuance of the agreement; and
(4) The acts occurred in the State of Washington.

toward the commission of the agreed crime, which can consist of mere preparatory conduct.

Id.

Fleming Ralston counters that the State's reliance on Gocken is misplaced because it is only dicta. He argues that a subsequent case, State v. Stein, 144 Wn.2d 236, 27 P.3d 184 (2001), is the controlling authority here because it clarifies "that conspiracy requires the same level of culpability as accomplice liability." Thus, he contends, "[t]o the extent Gocken's holding is not dicta, it is no longer good law." However, Fleming Ralston mischaracterizes Stein.

In Stein, the defendant was found not guilty of conspiracy to commit murder but convicted of three counts of attempting to commit murder in the first degree, all based on vicarious, or accomplice, liability. 144 Wn.2d at 238. At issue was whether the jury instructions properly conveyed the concept of accomplice liability. Id. at 244. The Stein court first noted that "[a]ccomplice liability requires knowledge and a completed crime," whereas "conspiracy requires intent and a substantial step towards completion." Id. at 242. It then reasoned that "[a]lthough the Washington [conspiracy] statute makes all parties to the conspiracy guilty of the *conspiracy itself*, it is silent on the subject of crimes committed by coconspirators," and "[n]o Washington case holds a defendant liable for the substantive acts of coconspirators without also satisfying the elements of accomplice liability." Id. at 244 (emphasis added). Thus, the jury instructions based on the federal Pinkerton[17] doctrine, "which held that a defendant is responsible for reasonably foreseeable acts committed by coconspirators," impermissibly allowed the jury to possibly convict the defendant of the "murder attempts perpetrated by his

---

[17] Pinkerton v. United States, 328 U.S. 640 (1946).

coconspirators even in the absence of proof that he knew of those attempts," as the accomplice liability statute requires. Stein, 144 Wn.2d at 243, 245. Therefore, Stein did not invalidate Gocken's holding on double jeopardy.

Here, for the conspiracy charge, the State had to prove Fleming Ralston had the intent to commit the "punishable criminal conduct" of a *plan* to commit first degree murder, Williams, 131 Wn. App. at 496, that Fleming Ralston agreed with one or more persons to engage in said plan or cause it to be performed, and that one of the co-conspirators took a substantial step to further the agreement. RCW 9A.28.040(1). But the State did not need to prove a completed crime. See Williams, 131 Wn. App. at 497. By contrast, the aggravated murder convictions based on accomplice liability required proof of the completed crimes of murder in the first degree, that Fleming Ralston had knowledge that his actions would promote or facilitate the commission of the crimes, and, for the aggravating circumstance, that there was more than one victim and the murders were part of a common scheme or plan. See RCW 9A.32.030(1)(a); RCW 10.95.020. Accordingly, we conclude that convictions for both conspiracy and aggravated murder in the first degree, as charged and proven, had different elements and do not violate double jeopardy.

## V.  Consecutive Life Sentences

At sentencing, the trial court imposed consecutive sentences of life without parole for Fleming Ralston's convictions on two counts of aggravated murder in the first degree. Fleming Ralston contends that the court lacked statutory authority to impose consecutive life sentences for his two convictions for aggravated first degree murder. We conclude that the rule of lenity favors Fleming Ralston's interpretation of the statute,

28

so that under RCW 10.95.030, sentences imposed for multiple mandatory life sentences without the possibility of parole (LWOP) run concurrently.

"[A] trial court's sentencing authority is necessarily limited to that granted by statute." Thus, "[w]here the trial court has no statutory authority to impose a particular sentence, it is invalid and must be corrected." State v. Buck, 2 Wn.3d 806, 824, 544 P.3d 506 (2024). Whether a sentencing court has exceeded its statutory authority is a question of law that we review de novo. Id. at 812.

Here, the operative statute specifies that "any person convicted of the crime of aggravated first degree murder shall be sentenced to life imprisonment without possibility of release or parole." RCW 10.95.030(1). However, the statute is silent as to how a court is to sentence multiple current convictions.

The State asserts that concurrent or consecutive sentencing is left to the discretion of the trial judge under RCW 9.92.080(2), which states,

> (2) Whenever a person is convicted of two or more offenses which arise from a single act or omission, the sentences imposed therefor shall run concurrently, unless the court, in pronouncing sentence, expressly orders the service of said sentences to be consecutive.
>
> (3) In all other cases, whenever a person is convicted of two or more offenses arising from separate and distinct acts or omissions, and not otherwise governed by the provisions of subsections (1) and (2) of this section, the sentences imposed therefor shall run consecutively, unless the court, in pronouncing the second or other subsequent sentences, expressly orders concurrent service thereof.

RCW 9.92.080(2), (3). In response, Fleming Ralston cites to Petition of Chapman, 105 Wn.2d 211, 213, 713 P.2d 106 (1986), which noted that "RCW 9.92.080 has been superseded by the Sentencing Reform Act of 1981 [(SRA), ch. 9.94A RCW] and does not control felonies occurring after 30 June 1984, RCW 9.94A.905." He notes that

similar to the SRA, the aggravated murder statute, RCW 10.95.030, was also enacted after RCW 9.92.080, a statute that the State argues provides discretion over sentencing. Therefore, he argues, because the aggravated murder statute provides express authority, it cannot be subverted by a general authority.

State v. Crumble, 142 Wn. App. 798, 177 P.3d 129 (2008), supports Fleming Ralston's argument that RCW 9.92.080 does not apply to his sentence. There, Crumble was convicted of, among other counts, two counts of attempted murder in the first degree. Id. at 799. The trial court sentenced him as a persistent offender to consecutive life sentences for these counts, citing RCW 9.94A.589,[18] the SRA's provision that controls whether the court can impose consecutive or concurrent sentences for multiple current offenses. Id. at 801. Division Two of this court agreed with the State that RCW 9.94A.570, also known as the Persistent Offender Accountability Act (POAA), was the "exclusive statutory authority for sentencing a persistent offender" and the controlling provision for sentencing Crumble, but that the POAA "says nothing about how to sentence multiple current 'third strikes,' much less whether sentences on those offenses should be served concurrently or consecutively." Id. at 802, 803. Because the sentences imposed on Crumble as a persistent offender were not calculated pursuant to the SRA, its provision directing when sentences should be consecutive to each other did not apply. Id. at 803. Instead, the court applied the SRA's default rule, RCW 9.94A.589(1)(a), which states that a court must generally impose concurrent sentences unless exceptional sentence provisions apply. Id. at 802.

---

[18] Covering "serious violent offenses," which include an attempt to commit murder in the first degree, RCW 9.94A.030(46)(a)(i), (ix), RCW 9.94A.589(1)(b) provides that "[a]ll sentences imposed under this subsection (1)(b) shall be served *consecutively* to each other." (Emphasis added.)

Here, as in Crumble, the controlling provision for the sentence is not part of the SRA; sentences for aggravated murder are imposed controlled by RCW 10.95.030. And RCW 9.92.080 is not part of the same immediate statutory scheme for aggravated murder and "does not control felonies occurring after 30 June 1984," which includes RCW 10.95.030.

But Crumble does not resolve the question of whether the aggravated murder statute, RCW 10.95.030, provides trial courts discretion to impose two mandatory LWOP sentences consecutively. We decline to follow Crumble's example of applying the SRA's default rule, RCW 9.94A.589(1)(a), to sentencing under RCW 10.95.030. Instead, we apply the rule of lenity, which "operates to resolve statutory ambiguities, absent legislative intent to the contrary, in favor of a criminal defendant." In re Pers. Restraint of Bowman, 109 Wn. App. 869, 875-76, 38 P.3d 1017 (2001). Because the controlling sentencing provision in RCW 10.95.030 is silent, under the rule of lenity, we interpret the statute to require Fleming Ralston's multiple current sentences for aggravated murder to run concurrently. We remand the trial court to modify his sentence accordingly.

## VI. Deadly Weapon Enhancements

Fleming Ralston argues that the trial court lacked authority to impose deadly weapon enhancements on the aggravated murder convictions because the sentence is not controlled by the SRA. The State agrees. We accept the concession.

At sentencing, in addition to imposing a mandatory life term, the court further imposed a 24-month deadly weapon enhancement on each of Fleming Ralston's sentences for aggravated murder in the first degree.

A court's authority to impose deadly weapon enhancements stems from RCW 9.94A.533. Subsection one of RCW 9.94A.533 states "[t]he provisions of this section apply to the standard sentence ranges determined by RCW 9.94A.510 or 9.94A.517." RCW 9.94A.533(1). Subsection four discusses the length of a deadly weapon enhancement and also clarifies that it only applies to "the standard sentence range." RCW 9.94A.533(4).

However, Fleming Ralston did not receive a "standard range sentence." Instead, his sentence is a definite term of life in prison under a different statutory scheme. RCW 10.95.030(1). RCW ch. 10.95 does not authorize deadly weapon enhancements. See State v. Rogers, 17 Wn. App. 2d 466, 477-78, 487 P.3d 177 (2021) ("This is clear, in that sentencing for aggravated murder in the first degree is not provided for within the SRA, and neither the provisions of the SRA nor the provisions of any other statute authorize courts to exercise discretion when sentencing upon a conviction for aggravated murder in the first degree."). Accordingly, the deadly weapon enhancements attached to Fleming Ralston's sentences for aggravated murder in the first degree should be stricken.

## VII. Imposition of LFOs

Fleming Ralston contends the court erroneously imposed LFOs despite his indigence. The State agrees. We accept this concession as to the VPA, DNA collection fee, and court filing fee, but affirm the imposition of interest on restitution.

At sentencing, the trial court ordered Fleming Ralston to pay the $500 VPA, a $100 DNA fee, and a $200 court filing fee. It also ordered that he pay interest on

restitution. The trial court also signed an order finding appellant indigent for purposes of appeal, and his motion for order of indigency verified his lack of assets.

The 2023 amendments that prohibit courts from imposing the VPA when the defendant is indigent, RCW 7.68.035(4), apply to matters pending on direct appeal. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023), aff'd in part, rev'd in part on other grounds, 4 Wn.3d 1009, 564 P.3d 547 (2025). The legislature also wholly eliminated the DNA collection fee, RCW 43.43.7541, and courts are no longer authorized to order an indigent person in a criminal case to pay a $200 filing fee. RCW 36.18.020(2)(h); State v. Ramirez, 191 Wn.2d 732, 746, 426 P.3d 714 (2018). Because Fleming Ralston is indigent, we remand to the sentencing court to strike the VPA, DNA fee, and court filing fee.

The legislature also amended the law governing the imposition of interest on restitution. Effective January 1, 2023, courts may waive restitution interest at sentencing. RCW 10.82.090(2). RCW 10.82.090 gives "courts flexibility to waive or reduce the interest on restitution." State v. Morgan, 4 Wn.3d 261, 270-71, 562 P.3d 360 (2025). This amendment to the restitution interest statute went into effect on January 1, 2023, LAWS OF 2022, ch. 260, § 12, and was in effect at the time of Fleming Ralston's sentencing on June 16, 2023. At sentencing, the State discussed restitution, but neither party discussed interest on restitution; rather, the parties both noted only that Fleming Ralston "signed off on the restitution order already." As Fleming Ralston could have challenged the imposition of interest on restitution below, but did not do so, we decline to consider this argument for the first time on appeal. RAP 2.5(a).

CONCLUSION

We affirm Fleming Ralston's convictions. We remand to the trial court to strike the VPA, DNA collection fee, and court filing fee, to strike the deadly weapons enhancements, and to run the sentences of life without parole for the two aggravated first degree murder convictions concurrently, as ministerial matters.

_____
Chung, J.

WE CONCUR:

_____      _____
Birk, J.                                  Mann, J.